**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No: 2:13-CR-36 |
| | ) | |
| CHRISTOPHER M. BOUR, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Motion for Victim Restitution, filed by the Government on July 25, 2014. (DE #95.) After due consideration, this motion is **GRANTED**. The Court hereby **ORDERS** Defendant to pay, forthwith, a total of $75,000 in victim restitution to the Clerk of the Court in this judicial district. As proceeds from the sale of Defendant's property in the amount of $8,303.64 are currently being held by the United States Marshal, the Court **ORDERS** the United States Marshal to surrender those funds to the Clerk of the Court immediately as partial restitution payment.[1] The Clerk of the Court is **ORDERED**, in turn, to disburse

---

[1] The net proceeds from the sale totaled $8,803.64; however, Defendant and the Government agreed that $500 of that amount would be used to pay for the $100 per count special assessment that Defendant also owes. (See DE #95, p. 3, n. 1.) Defendant has filed a "Motion for Order to the United States Marshal to Pay Special Assessment." (DE #110.) That motion is **GRANTED**, and the United States Marshal is hereby **ORDERED** to surrender $500 of this total

1

those and any future funds received from Defendant (or on his behalf) to Jane Doe and Jane Doe 2 c/o attorney Geoffrey Giorgi at 9205 Broadway, Suite B, Merrillville, IN 46410 (Telephone: 219-738-1133). Pursuant to his appointment by the Lake County Superior Court, attorney Geoffrey Giorgi is, in turn, **DIRECTED** to equally divide any and all restitution funds received in this case and to deposit those funds into Horizon Bank Account # 2627313 and/or Horizon Bank Account # 2627326, which accounts are to be maintained for the sole benefit of Jane Doe and Jane Doe 2 until this restitution obligation has been met in full and all funds collected have been disbursed to Jane Doe and Jane Doe 2, or, in the case of their early passing, to their heirs.

BACKGROUND AND FACTS

On June 5, 2013, a Superceding Indictment was filed charging Defendant, Christopher M. Bour, with the following: (1) Count 2 - purchasing Jane Doe, an infant child, with knowledge that she would be portrayed in a visual depiction assisting him to engage in sexually explicit conduct in violation of 18 U.S.C. section 2251A(b); (2) Counts 3 & 4 - producing child pornography featuring Jane Doe in violation of 18 U.S.C. section 2251(a); (3) Count 5 - producing child pornography featuring Jane Doe 2 also in violation

---

amount to the Clerk of the Court for payment towards Defendant's special assessment.

of 18 U.S.C. section 2251(a); and (4) Count 8 - possessing child pornography in violation of 18 U.S.C. section 2252(a)(4). (DE #32.) The Superceding Indictment includes forfeiture allegations referencing Defendant's residence at the time of his arrest as 5190 Indiana Place in Gary, Indiana. (*Id*. at 9.)[2] Defendant pled guilty to all counts without the benefit of a plea agreement, and this Court adjudged him guilty on January 30, 2013. (DE's #47 & #50.) A sentencing hearing was held on May 15, 2014, wherein Defendant was sentenced to life in prison.[3] (DE #67.)

During the sentencing hearing, the Court questioned the parties about their preliminary restitution agreement. (DE #94, pp. 25-28.) The Government indicated that Defendant, through his attorney, had agreed to pay approximately $8,300 towards victim restitution from the sale of his Gary, Indiana property, but that more time was needed to finalize the restitution details which included having a Guardian Ad Litem appointed and a bank account set up for the victims' benefit. (*Id.*; see also DE #95, pp. 2-3.) The Government further noted that it intended to seek additional restitution from Defendant above and beyond the agreed upon amount.

---

[2] The property was sold, and the net proceeds of $8,803.64 are currently being maintained by the United States Marshal. (See DE #95, p. 2; see also DE #110, p. 1.)

[3] Defendant was sentenced to Life on Count 2, a term of 360 months, on each of Counts 3 and 4; a term of 180 months on Count 5; and a term of 120 months on Count 8, all to be served consecutively (for a total of Life plus 1020 months).

3

(*Id*.)  The Court set a deadline of August 5, 2014, for the restitution determination.  (DE #67.)

In May, Attorney Geoffrey Giorgi was appointed as Guardian Ad Litem for the Estate of Minor Children Jane Doe and Jane Doe 2, and bank accounts were set up for the children with Horizon Bank in June.  (DE #95, p. 3.)  Throughout June and July of 2014, the parties (including co-Defendant Natisha Hillard) participated in restitution settlement negotiations.  (*Id*. at 4.)  While Natisha Hillard ultimately agreed to pay $12,500 in restitution to each child, Defendant, through his attorney, notified the Government that he did not agree to any additional amount of restitution.  (*Id*.)  Thus, the Government filed the instant Motion for Victim Restitution on July 25, 2014.  (*Id*.)  In it, the Government requested that the Court enter an order requiring Defendant to pay victim restitution of $37,500 to each of Jane Doe and Jane Doe 2 pursuant to 18 U.S.C. section 2259. (*Id*. at 1.)  The Court ordered Defendant to file a response by August 4, 2014.  (DE #96.)

On July 31, 2014, Defendant's attorney, Matthew Soliday, filed a motion to withdraw noting that Defendant wished to represent himself regarding the restitution matter.  (DE #97.)[4]  That same day, the Government filed a response asking the Court to set a

---

[4] Defendant later filed *pro se* motions asking that Attorney Soliday be terminated, that the deadline to respond be extended, and that his "inmate legal assistants" be allowed to participate in the restitution hearings.  (DEs #99, #100, #104.)

hearing on the motion to withdraw and to make clear that it intended to order some amount of restitution in the case. (DE #98, pp. 2-4.) On August 12, 2014, a hearing was held wherein the Court granted the motion to withdraw, allowed Defendant to proceed *pro se*, struck Defendant's previously filed motions, and allowed his *pro se* response to the Government's restitution motion to stand. (DE #107; see also Defendant's refiled response at DE #108.) The Court took the motion for victim restitution under advisement and stated the following via written order:

> Pursuant to the Mandatory Restitution Act ("MRA"), this Court finds restitution to be applicable in this case. 18 U.S.C. § 3664. However, the Court is still receiving information and briefing from the parties regarding possible restitution payments that may be owed. Therefore, while the Court intends to order restitution, the Court is not in a position to make a final determination within the 90 day deadline set out in the MRA. 18 U.S.C. § 3664(d)(5). A final determination of restitution will be forthcoming. See *Dolan v. United States*, 560 U.S. 605 (2010)(holding that a sentencing court can order restitution more than 90 days after sentencing when it makes clear prior to the deadline's expiration that it would order restitution).

(DE #106.) The Government filed its reply on August 15, 2014. (DE #109.) Defendant filed a Motion to Order the United States Marshal to Pay Special Assessment on August 28, 2014. (DE #110.) The Government has not responded to that motion. Finally, Defendant filed a sealed, ex parte motion on September 22, 2014, which will be dealt with via separate order. (DE #113.) Thus, all motions

are ripe for adjudication.

As noted above, the Government's motion requests that the Court enter an order requiring Defendant to pay victim restitution of $37,500 to each of Jane Doe and Jane Doe 2. In support of this request, the Government has submitted a report from Myra D. West, a licensed clinical psychologist, who has concluded that, because of their experiences, Jane Doe and Jane Doe 2 will likely "need a minimum of 5-10 years of counseling, once a week for each of these victims, keeping in mind that there are significant, potentially lifelong, effects of their sexual abuse/traumatic experiences and the range could, in fact, be much larger."[5] (DE #95-1, p. 2.) In coming to this conclusion, although she did not interview the victims, Dr. West reviewed the record and became familiar with the facts of this case, considered social science research and empirical evidence as discussed in her report, and relied upon her extensive experience interviewing and treating victims of childhood sexual abuse. (*Id.* at 1-2; DE #109-5, Curriculum Vitae of Myra D. West.)[6] In her report, Dr. West discusses the impact of childhood sexual abuse and the resultant need for treatment. (DE #95-1, p. 1.) She acknowledges the potential psychiatric difficulties, health risks, medical diseases, and relational problems associated

---

[5] Dr. West notes that the current average cost of therapy sessions is approximately $125 hourly. (DE #95-1, p. 2.)

[6] See also http://www.cdc.gov/violenceprevention/acestudy/.

with such abuse. (*Id.*) Dr. West points out that these issues can be exacerbated when a victim's parent is involved in the abuse. (*Id.*) Citing to Bruce Perry, PhD, (2009), Dr. West also notes that it is a common misperception that infants and toddlers are unlikely to remember their abusive/traumatic experiences because:

> [T]he brain is designed to store and recall our experiences in multiple ways; . . . motor, vestibular, emotional, social and cognitive memories and that it is the experiences of early childhood that create the foundational organization of neural systems that will be used for a lifetime. . . . [T]he long term adverse effects of sexual abuse in infancy are the result of memories – physiological state memories, motor-vestibular memories and emotional memories, which in later years can be triggered by a host of cues that are pervasive. Although an infant may not retain a cognitive memory of their sexually abusive experiences, . . . the relational difficulties mentioned previously have their roots in this betrayal in infancy.

(*Id.* at 1-2) (internal quotation marks omitted). Dr. West states that therapy at varying times throughout their development is an "essential component" of working with such victims and that "[w]hile the content of all sessions may not be related specifically to the sexual abuse or trauma experienced, the treatment is directly related to the abusive/traumatic events and the impact they have on the child's overall development and relational attachments." (*Id.* at 2.) Dr. West also notes that additional, ongoing therapy may be necessary to address the "disrupted attachment with their caregiver and to assist in the

7

development of attachment to other appropriate adults and caregivers in the child's life" in situations where children are separated from their parents as a result of sexual abuse or traumatic experiences. (*Id.*)

The Government argues that, based on Dr. West's conclusion that each child will likely need a minimum of 5-10 years of counseling, $50,000 per victim for future psychological treatment is a reasonable, conservative estimate.[7] (DE #95, pp. 6-7.) The Government further argues that Defendant should pay the bulk of these costs (as opposed to co-Defendant Natisha Hilliard) as he was responsible for causing 75% of the harm to the victims because:

> a. Bour proposed that he sexually abuse the victims and attempted to put Hillard at ease by claiming to have had a similar arrangement in the past with a woman from Illinois;
>
> b. Bour induced Hillard, a single unemployed mother with few reliable sources of financial support, to consent to the abuse by offering to pay her cash in exchange for each abuse session;
>
> c. Bour alone sexually abused Jane Doe and took the sexually explicit photographs of Jane Doe 2;
>
> d. Bour threatened Hillard that if she did not allow the abuse to continue, he would report her to Child Protective Services and she could lose custody of her children;
>
> e. Bour initiated most of the approximately eight abuse sessions that took place; and

---

[7] Five years of weekly therapy sessions at $125 per session equals $32,500; ten years of weekly therapy sessions at the same rate equals $65,000.

8

> f. According to a psychologist who examined Hillard, she has an IQ of 75 and due to her background and circumstances was particularly susceptible to Bour's manipulation.

(*Id.* at 7-8; see also 18 U.S.C. § 3664(h).)

Defendant, on the other hand, argues that he owes nothing in the form of restitution because: (1) he did not distribute the documented child abuse/pornography so there can be "no further harm caused by this documentation;" (2) the victims were both very young and are unlikely to remember any of the abuse inflicted upon them; (3) any disruptive attachment issues the victims have suffered or may suffer in the future are not his fault because the "choice of [Natisha Hillard] to be a single mother is in no way connected to [him];" and (4) Jane Doe and Jane Doe 2 are not "victims" as required under section 2259 because "the Government has not shown that [they have] currently incurred any loses relating to medical services such as for Physical damage, due to the fact that the Defendant did not inflict and Physical damages to either Jane Doe or Jane Doe 2, or psychiatric, or psychological care, as neither are currently seeking any care from a psychologist."[8] (DE #108, pp. 1-4 & 8-12.)

The Government's reply reasserts its initial arguments and provides additional documentation in support of its request. (DE #109; see also exhibits at DE #109-1 through 5.)

---

[8] The Court has inserted Defendant's response without attempting to make grammatical or spelling corrections.

9

DISCUSSION

Pursuant to the Violence Against Women Act of 1994, district courts must award restitution in certain circumstances, including for victims of those crimes involving the sexual exploitation of children and child pornography. *Paroline v. United States*, --- U.S. ----, 134 S.Ct. 1710, 1716 (2014); 18 U.S.C. § 2259. Section 2259 requires district courts to order defendants "to pay the victim . . . the full amount of the victim's losses as determined by the court" and states that "[t]he issuance of a restitution order under this section is mandatory." 18 U.S.C. § 2259(b)(1), (b)(4)(A). The statute defines "full amount of the victim's losses" as any costs incurred by the victim for:

> (A) medical services relating to physical, psychiatric, or psychological care;
> 
> (B) physical and occupational therapy or rehabilitation;
> 
> (C) necessary transportation, temporary housing, and child care expenses;
> 
> (D) lost income;
> 
> (E) attorneys' fees, as well as other costs incurred; and
> 
> (F) any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3). Anticipated future costs of psychiatric treatment and psychological care may be included as part of a victim's restitution award. *United States v. Danser*, 270 F.3d 451, 455 (7th Cir. 2001). In response to the argument that victims of

abuse should be required to petition court's on an ongoing basis as treatment costs are incurred, the Seventh Circuit stated:

> We do not believe that Congress sought to create such a cumbersome procedure for victims to receive restitution. In enacting section 2259, it is clear that Congress intended to provide victims of sexual abuse with expansive relief for 'the *full* amount of . . . [their] losses' suffered as a result of abuse, § 2259(b)(3)(B) (emphasis added). Congress chose unambiguously to use unqualified language in prescribing full restitution for victims. Indeed, in the legislative history of the contested statute, Congress cites the United States Supreme Court's landmark decision in *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). In that case, the Court discussed, at great length, the devastating and long term effects that the sexual exploitation of children can have both upon the victims of that abuse and greater society. *Id*. In light of Congress's intent to make whole those victims of sexual exploitation, we find that section 2259 allows for restitutionary damages for the future costs of therapy.

*Id*.

The statute itself imposes a "general proximate-cause limitation" on these types of restitution awards that "forecloses liability in situations where the causal link between conduct and result is so attenuated that the so-called consequence is more akin to mere fortuity." *Paroline*, 134 S.Ct. at 1721. Restitution is only proper "to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 1722. In cases involving producers of child pornography, parents who permit their children to be used for child pornography production, and individuals who

11

sell children for such purposes, a showing of but-for causation can be shown with ease, and the general proximate cause limitation is satisfied with "little difficulty." *Id*. However, even in cases where strict but-for causation cannot be shown (i.e. an anonymous possessor of child pornography images in circulation on the Internet), "a court applying [section] 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Id*. at 1727. In either situation, the restitution amount should be "a reasonable and circumscribed award imposed in recognition of the indisputable role of the offender in the causal process underlying the victim's losses and suited to the relative size of that causal role." *Id*. The Government must prove the amount and type of victim restitution by a preponderance of the evidence. 18 U.S.C. § 3364(e).

In this case, it is undisputed that Defendant sexually abused Jane Doe on videotape and took sexually explicit photographs of Jane Doe 2. Defendant's actions towards Jane Doe and Jane Doe 2 have been described repeatedly in the record and need not be set forth in detail again here. Suffice it to say, as noted by this Court during Defendant's sentencing, the abuse was exceedingly horrific and shocking. The fact that Defendant did not distribute the recordings of his abuse on the Internet does not negate a finding that the victims were indeed harmed by Defendant and that

restitution is proper. As noted by the Supreme Court, the general proximate cause limitation is generally *easier* to satisfy when dealing with the original sexual abusers and producers of child pornography because the harm would not have occurred but-for the actions of the offender. *Paroline*, 134 S.Ct. at 1722. Defendant's assertion that children can only be harmed when pornography is distributed, rather than when the actual production and/or sexual abuse itself took place, is ludicrous. Both the production of child pornography and the resultant distribution can cause children to be traumatized; the fact that the two evils are oftentimes intrinsically linked does not make the initial production and/or sexual abuse in and of itself harmless. See *New York v. Ferber*, 458 U.S. 747, 758 (1982) (noting that "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child" and citing in a footnote to various studies indicating that "sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults"). In fact, the Seventh Circuit has affirmed a significant restitution award in a case where child pornography was produced but not distributed by a defendant. See *United States v. Danser*, 270 F.3d 451, 453-56 (7th Cir. 2001) (although the images were never distributed, victim's therapist testified that the victim suffered severe mental and physical trauma as a result of

13

the abuse that was recorded by the defendant and that the victim would "likely develop several long-term emotional problems" and would "require long-term mental health care, quite possibly for the rest of her life").

Here, Dr. West, a licensed clinical psychologist who has been the Director of the Children's Advocacy Center at La Rabida Children's Hospital in Chicago, Illinois since May of 2007, has provided a report stating that Jane Doe and Jane Doe 2 have been harmed by the sexual abuse and/or sexual exploitation described in the record and are likely to need a minimum of five to ten years of weekly therapeutic counseling as a result. Although Defendant argues that Dr. West's conclusions are "unsupported assumptions," the Court finds that her opinions are persuasive and supported by the record. Dr. West notes that she is familiar with the case and has reviewed the record (including the undisputed and detailed descriptions of Defendant's actions). She also cites to relevant social science research and empirical evidence in her report indicating that victims of childhood trauma, including sexual abuse and/or exploitation, are more likely to experience difficulties with substance abuse, obesity, high-level promiscuity, depression, anxiety, posttraumatic stress disorder, medical diseases, and relational problems later in life.[9] Dr. West recognizes that, for

---

[9] In addition, the Court has read through the studies provided by the Government in its reply and finds them relevant and persuasive. (See DE #109-1 through 4.)

very young children who have experienced sexual abuse and/or traumatic exploitation, therapy may be necessary throughout several different time periods because their emotional, cognitive, and behavioral reactions may vary during their development. She also cites to research to dispel Defendant's assertion that Jane Doe and Jane Doe 2 were too young to have been harmed by his actions. As Dr. West points out, early childhood experiences create the foundation for a lifetime of behaviors. Although an infant may not retain a "cognitive memory" of their abusive experiences, they are likely to sustain numerous later difficulties based on that "betrayal in infancy."[10] Dr. West stresses that therapy is an "essential component" of working with sexually abused and/or exploited children and that having proper support from a mental health professional is necessary to understand and deal with the victim's possible reactions to the abuse. The Court finds that Dr. West's position, training, and education (as shown by her Curriculum Vitae) lend her evaluation and overall opinion in this case great credibility.

The fact that Dr. West did not interview the victims makes her opinion no less credible when viewed in light of her expedience and evaluation strategies noted above. The Court agrees with the

---

[10] Dr. West quotes Bruce Perry, PhD, (2009), in noting that "the long term adverse effects of sexual abuse in infancy are the result of memories – physiological state memories, motor-vestibular memories and emotional memories, which in later years can be triggered by a host of cues that are pervasive."

15

Government that there is neither a need for nor a requirement to conduct child forensic interviews when the undisputed abuse has been videotaped and described in detail for the consulting expert; this is especially true when the victims are currently aged three and six. See also 18 U.S.C. § 3664(g)(1) ("No victim shall be required to participate in any phase of a restitution order.").

Furthermore, Defendant's argument that he cannot be held responsible for any of the potential difficulties described by Dr. West associated with the disrupted attachment of Jane Doe and Jane Doe 2's caregiver (co-Defendant Natisha Hillard) is unavailing. It is clear from the record that Defendant knew Natisha Hillard was a single parent when he met her, and it is highly likely that this was one of the specific reasons he targeted her children for abuse. Defendant knew that Jane Doe and Jane Doe 2 had no strong male presence in their lives, and he used that fact to his advantage. As the Government points out, Natisha Hillard was especially vulnerable to Defendant's manipulations *because* she was a single mother with little monetary wealth and a relatively low IQ. Furthermore, once the abuse began, Defendant threatened Natisha Hillard with the loss of her children if she refused to let it continue. He cannot now disclaim responsibility for the harm suffered by Jane Doe and Jane Doe 2 related to the loss of their only caregiver when such harm was clearly foreseeable to Defendant. See *Paroline*, 134 S.Ct. at 1719 (proximate cause is a "flexible

16

concept that generally refers to the basic requirement that . . . there must be some direct relation between the injury asserted and the injurious conduct alleged") (internal quotation marks and citations omitted). Here that standard is satisfied with ease.[11]

Therefore, the Court finds that the Government has proven, by a preponderance of the evidence, both that Jane Doe and Jane Doe 2 were harmed by the commission of Defendant's crimes and that the resultant likely future psychological treatment costs will range, at the very least, from $32,500 to $65,000 for each victim. Although a precise mathematical calculation is not possible, the Court finds that Dr. West's evaluation and rationale for the estimated treatment costs are sound and that the Government's request of $50,000 for each victim is reasonable. It falls squarely between the likely minimum and maximum amounts noted above, and it does not take into consideration inflation, potential in-patient therapy, or prescription drug costs.[12] Furthermore, the

---

[11] Defendant spends several pages of his response brief questioning the "true intent" of the Government's request and arguing that the real reason for seeking restitution is "to provide retribution." (See DE #108, pp. 4-8.) Defendant mainly premises this argument on his belief that "the Government never intended the restitution money to be available for the children in the event they need counseling." (*Id*. at 5.) The Government has since clarified that this is obviously not the case. "[T]hat statement was not intended to suggest that the Guardian Ad Litem could not use the funds to pay the victims' counseling costs in the meantime, as that would defeat the primary purpose of seeking restitution. Rather, the [G]overnment was reassuring the Court that the victims themselves would not be able to control how the restitution funds are spent until after they reach adulthood, when Mr. Giorgi's appointment expires." (DE #109, p. 16.) Defendant's argument to the contrary is a non-starter and need not be further addressed.

[12] Defendant argues that reasonable estimates of anticipated future therapeutic costs cannot be awarded in this case. This argument is without merit. The Seventh Circuit has specifically allowed such awards where, as

17

Government's analysis regarding contribution and apportionment is convincing. The Court finds that Defendant is responsible for 75% of the harm suffered by Jane Doe and Jane Doe 2. Defendant sought out co-Defendant Natisha Hillard and initially suggested the sexually abusive arrangement, he provided her with much need monetary incentive to convince her to allow him to have access to her children, he attempted to put Natisha Hillard at ease with the situation by claiming to have had a similar arrangement with another mother in the past, he threatened her with the loss of her children in order to ensure that the abuse would continue, he initiated most of the abusive sessions himself, and he alone sexually abused Jane Doe and took sexually explicit photographs of Jane Doe 2. As such, it is reasonable to conclude that 75% of the harm be apportioned to Defendant, and he shall be required to pay each victim $37,500 in restitution. See 18 U.S.C. § 3664(h).

CONCLUSION

For the reasons set forth above, the Motion for Victim Restitution filed by the Government (DE #95) is **GRANTED**. The Court hereby **ORDERS** Defendant to pay, forthwith, a total of $75,000 in victim restitution to the Clerk of the Court in this judicial

---

here, the district court found that the defendant harmed the victim during the commission of his crimes and that such future therapeutic costs were necessary to fully compensate the victim for her losses. See *Danser*, 270 F.3d at 455-456.

district. As proceeds from the sale of Defendant's property in the amount of $8,303.64 are currently being held by the United States Marshal, the Court **ORDERS** the United States Marshal to surrender those funds to the Clerk of the Court immediately as partial restitution payment.[13] The Clerk of the Court is **ORDERED**, in turn, to disburse those and any future funds received from Defendant (or on his behalf) to Jane Doe and Jane Doe 2 c/o attorney Geoffrey Giorgi at 9205 Broadway, Suite B, Merrillville, IN 46410 (Telephone: 219-738-1133). Pursuant to his appointment by the Lake County Superior Court, attorney Geoffrey Giorgi is, in turn, **DIRECTED** to equally divide any and all restitution funds received in this case and to deposit those funds into Horizon Bank Account # 2627313 and/or Horizon Bank Account # 2627326, which accounts are to be maintained for the sole benefit of Jane Doe and Jane Doe 2 until this restitution obligation has been met in full and all funds collected have been disbursed to Jane Doe and Jane Doe 2, or, in the case of their early passing, to their heirs.

**DATED: January 5, 2015**           /s/RUDY LOZANO, Judge
                                     **United States District Court**

---

[13] The net proceeds from the sale totaled $8,803.64; however, Defendant and the Government agreed that $500 of that amount would be used to pay for the $100 per count special assessment that Defendant also owes. (See DE #95, p. 3, n. 1.) Defendant has filed a "Motion for Order to the United States Marshal to Pay Special Assessment." (DE #110.) That motion is **GRANTED**, and the United States Marshal is hereby **ORDERED** to surrender $500 of this total amount to the Clerk of the Court for payment towards Defendant's special assessment.